NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0366n.06

No. 25-1038

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jul 23, 2025
KELLY L. STEPHENS, Clerk

SCHULTZ EXCAVATING & ASPHALT OF
LUDINGTON, LLC,

    Plaintiff-Appellee,

v.

SMYRNA READY MIX CONCRETE, LLC, dba
SRM Concrete,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF MICHIGAN

OPINION

---

Before: COLE, GIBBONS, and BUSH, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** Claiming to be from Schultz Excavating & Asphalt of Ludington (Schultz), a fraudster tricked Smyrna Ready Mix (Smyrna) into sending two checks totaling $267,658.50 to an address in Florida. The fraudster then deposited those checks and got away with it. Under Michigan Law, Smyrna bore no responsibility except to the extent that its failure to exercise ordinary care contributed to the loss. Finding that this exception applied, the district court held Smyrna entirely responsible. We affirm.

**I.**

Schultz and Smyrna were business partners. Schultz provided transportation services to Smyrna, and Smyrna supplied concrete and other building materials to Schultz. Sometime after 2019, the two started trading invoices over email instead of hardcopy. After receiving an emailed invoice, each company mailed a check to the other. Schultz mailed its checks to Smyrna's address

in Murfreesboro, Tennessee. And Smyrna mailed its checks to Schultz's address in Ludington, Michigan.

In May 2022, Schultz's bookkeeper, Tammy Britton, received an email from loriDuddles@Smyrnareadymix.com, a legitimate Smyrna email address, asking Schultz to send Smyrna's checks to a new payee, Donald Ault, at a new address in Bonita Springs, Florida. Britton found the email suspicious, so she called Smyrna to confirm its authenticity. Smyrna confirmed the email was fake. Neither Schultz nor Smyrna took action in response to the attempted fraud.

On July 21, Smyrna received an email appearing to come from Schultz's legitimate email address, schultzexcavating@yahoo.com. This too was a fraudulent email. Like the May email to Schultz, this email asked Smyrna to begin paying Schultz's checks to a new payee, Deault Enterprises, at a new address in Estero, Florida. The fraudster also attached a W-9 form that appeared to have Tammy Britton's signature. On October 19, Smyrna mailed a $227,441.42 check to that Florida address, which was deposited on November 2.

Smyrna received another fraudulent email on November 30 requesting a payment of $40,217.18. This time though, the email came from an address with an extra "i" in it: schulitzexcavating@yahoo.com. On December 7, Smyrna sent a $40,217.18 check to the Florida address. On December 12, Smyrna received another email from the "schulitz" email account asking for an update on the payment. On December 16, the check was deposited. In sum, Smyrna sent a total of $267,658.50 to the Florida address, believing that the checks were sent to Schultz.

A few days later, the parties discovered the fraud. The discovery occurred when a Smyrna employee delivered a holiday gift to Schultz's office, and Britton mentioned that Smyrna had not paid Schultz for six months. After some investigation, it became clear that a fraudster had asked

Smyrna to change Schultz's mailing address to the Florida address. Nobody has identified the fraudster.

Schultz sued Smyrna in Michigan state court to recover the value of the lost payments. Smyrna then removed the case to federal court. The district court held a bench trial. Because the fraudster appeared to send emails from legitimate email addresses at both companies, each party argued in part that the other had been hacked and was therefore responsible for the loss. The district court, in its oral finding of facts, said:

> We do not know how the imposter got in. I don't believe anyone has proven to me by a preponderance of the evidence how the imposter got in. A legitimate e-mail of Smyrna's was used by the imposter right in May. A legitimate e-mail of Schultz' was used by the imposter from July going forward, so I cannot deduce who got hacked.

R. 55, PageID 912.

The court ultimately ruled in Schultz's favor, finding that Smyrna's failure to exercise ordinary care contributed to the loss and that Schultz did not contribute to the loss:

> [Smyrna] contributed to the loss and they bear the full responsibility for that contribution. Had they not been phished, through no fault established by Schultz, they wouldn't have changed the provider name to the imposter location, different entity, different location, and then all the bills went to the wrong person, so it was their contribution of failure to exercise reasonable care that led to the entire payment of both bills.
> . . .
> [S]o the counterpoint is did any failure to exercise ordinary care by Schultz contribute to the loss, and I do not believe that I have evidence to establish that they were hacked by a preponderance of the evidence, so even though we had a vulnerable [email] server, I cannot find by a preponderance of the evidence that they contributed to this loss.

R. 55, PageID 915. Smyrna appealed.

## II.

We review the district court's legal conclusions de novo and its factual findings for clear error. *Dillon v. Cobra Power Corp.*, 560 F.3d 591, 599 (6th Cir. 2009).

3

Smyrna argues that the district court failed to hold Schultz to its applicable burden of proof. Its only authority is a Michigan statute, MCL § 440.3404. Derived from Article 3-404 of the Uniform Commercial Code, this section provides that a payor (Smyrna) who pays a fraudster has no obligation to compensate the payee (Schultz) if the payor believed in good faith that the fraudster was the payee. MCL § 440.3404(1). However, if the payor, "fails to exercise ordinary care . . . the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss." MCL § 440.3404(4). Based on this language, Smyrna argues that:

> Schultz bears the burden of proof as to the extent of Smyrna's fault—it must prove, for example, that Smyrna was 40% at fault, or 80% at fault, or even 100% at fault. And for Schultz to prove that Smyrna is 100% at fault, Schultz bears the burden of proving Schultz was 0% at fault. . . . [F]or Schultz to be able to establish that "the extent" of Smyrna's contribution to the loss was 100%, Schultz would have to show that Schultz was not hacked and so contributed 0% to the loss.

Appellant's Br. at 17–18.

This argument misunderstands burdens of proof. True, Schultz had to prove that Smyrna was 100% responsible for the loss, and tautologically that means Schultz had to be 0% responsible. But Schultz did not have to present evidence about its lack of culpability—it did not need to find Russell's Teapot. *See Cavanaugh v. Bartelt*, 178 F. Supp. 3d 819, 826 (D. Neb. 2016). Schultz only needed to present evidence that, standing alone and with "the benefit of every reasonable inference," would have allowed "reasonable minds [to] differ with regard to whether" Smyrna was fully responsible for the loss. *Teodorescu v. Bushnell, Gage, Reizen & Byington*, 506 N.W.2d 275, 277 (Mich. Ct. App. 1993); *see also Kusens v. Pascal Co.*, 448 F.3d 349, 360 (6th Cir. 2006) ("In diversity cases, when a Rule 50 motion for judgment as a matter of law is based on a challenge to the sufficiency of the evidence, this Court applies the standard of review used by the courts of the state whose substantive law governs the action.").

4

Smyrna, in its own presentation of evidence, could have rebutted Schultz's showing by demonstrating that Schultz was hacked or otherwise contributed to the loss. It attempted to do so by showing that Schultz failed to secure its emails. And it succeeded in part. The district court found that, in 2020, it was not "commercially reasonable to use a Yahoo account for your business[.]" R. 55, PageID 912. It also agreed with Smyrna that "Yahoo is a dangerous place to reside as a commercial entity and sharing passwords is a dangerous habit to do and having multiple people write under one name is a bad idea[.]" *Id.* at 914. But Smyrna failed to convince the district court that these actions contributed to the loss. *Id.* at 915.

On appeal, Smyrna has not argued that its evidence was so strong that the district court committed clear error by exonerating Schultz. Instead, it only complains that "[t]he district court held Smyrna responsible for steps it did not take that might have prevented the loss, but it did not hold Schultz responsible for steps Schultz did not take that might have prevented the loss." Appellant's Br. at 21–22. In other words, Smyrna quibbles with the district court about what actions contributed to the loss. But these types of inferences fall within the factfinder's discretion, so long as there is sufficient evidence to support them. *Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648 (1969).

Smyrna does not argue that the evidence was insufficient to conclude that it contributed to the loss. Rather, it argues that because "the district court found that both parties failed to act in a commercially reasonable manner, it was clear error for the district court to allocate 0% of the loss to Schultz and 100% of the loss to Smyrna." Appellant's Br. at 24. But for commercially unreasonable behavior to affect the allocation of liability, it must have "contributed to the loss." MCL § 440.3404(4). Smyrna does not point to any fact in the record suggesting that Schultz's

commercially unreasonable email account contributed to the loss. So it cannot show that the district court committed clear error.

The lone case that Smyrna cites cannot save it. In *Beau Townsend Ford Lincoln, Inc. v. Don Hinds Ford, Inc.*, 759 F. App'x 348 (6th Cir. 2018), a case with similar facts to this one, a panel of this court reversed a grant of summary judgment for a company that had negligently maintained its email server. But the posture of the case makes all the difference. The *Beau Townsend* court noted that "[n]o court can resolve . . . factual disputes at the summary judgment stage" and remanded for trial because "both parties support[ed] their respective arguments with record evidence suggesting the other party was at fault." *Id.* at 358–59.

*Beau Townsend* might have had currency here at the summary judgment stage, but it has none post-trial. At this stage, rather than show that an open question of fact exists, Smyrna needs to convince us the opposite is true. It must show that the evidence of Schultz's contribution to the loss was so overwhelming that the district court committed clear error in not assigning it fault. But Smyrna presents no argument from the evidence. It only makes conclusory assertions that Schultz's weak email security must have contributed to the loss. That is not enough.

### III.

Ultimately, it was Smyrna who, when asked to send hundreds of thousands of dollars to "a new payee to a new named company in a new state, [made] not one effort . . . to call Schultz to say, is this correct?" R. 55, PageID 914. To the district court, that would have been "a very, very simple fix." *Id.* It assigned Smyrna full responsibility for its failure to exercise reasonable care. That was not clear error. We affirm.